UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**FILED**

JAN 2 2 2003

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

UNITED STATES OF AMERICA      )
                             )
     v.          **DOCKETED**      )      No. 02 CR 892
                  JAN 2 4 2003 )
ENAAM M. ARNAOUT,                  )      Violations: Title 18, United
     a/k/a "Abu Mahmoud",          )      States Code, Sections 2,
     a/k/a "Abu Mahmoud al Suri",  )      371, 1341, 1343, 1956, 1962,
     a/k/a "Abu Mahmoud al Hamawi", )     2339A
     a/k/a "Abdel Samia"           )
                             )      SECOND SUPERSEDING INDICTMENT

### COUNT ONE

JUDGE CONLON

The SPECIAL APRIL 2002 GRAND JURY charges:

MAGISTRATE JUDGE LEVIN

1.   At all times material to this indictment:

#### RELEVANT ORGANIZATIONS

#### *Mekhtab al Khidemat*

A.   In the latter part of the 1980's, an organization known as "*mekhtab al khidemat*" (the "Services Office") maintained offices and facilities in various parts of the world, including Afghanistan, Pakistan and the United States.  The organization was operated principally by Sheik Abdallah Azzam and Usama Bin Laden for purposes including the providing of logistical support to the *mujahideen* (fighters) in Afghanistan.  The support provided included financial assistance for military training as well as assistance with obtaining travel and identity documents and immigration status in Pakistan.

B.   Until his death in or about 1989, Sheik Abdallah Azzam continued to work with *mekhtab al khidemat* to provide

logistical and financial support to the *mujahideen*. After Azzam's death, *mekhtab al khidemat* continued to provide such logistical and financial support.

### Al Qaeda

C.   In or about 1988, Usama Bin Laden began directing resources to train *mujahideen* for eventual deployment to places outside Afghanistan.  In or about August 1988, Usama Bin Laden and others (including Mamdouh Salim, a/k/a "Abu Hajer al Iraqi") held a series of meetings in Afghanistan during which the *al Qaeda* (the "Base") organization was formed.  In or about 1991, the leadership of *al Qaeda*, including Usama Bin Laden, relocated to the Sudan.  *Al Qaeda* was headquartered in the Sudan from approximately 1991 until approximately 1996 but still maintained offices in various parts of the world.  In 1996, Usama Bin Laden and other members of *al Qaeda* relocated to Afghanistan.  Members of *al Qaeda* pledged an oath of allegiance (called a "*bayat*") to *al Qaeda*.  Usama Bin Laden used the *al Qaeda* organization, as well as affiliated organizations, to provide financial and logistical support to *mujahideen* in various areas of the world.  *Al Qaeda* had a command and control structure which included a *majlis al shura* (or consultation council) which discussed and approved major undertakings, including terrorist operations.

D.   In addition to participating in armed confrontations in Afghanistan, *al Qaeda*, acting on its own as well as in concert

with other groups, also participated in armed confrontations and violence in other locations, including Bosnia-Herzegovina, Chechnya and the Sudan.

E. In addition, beginning in or around 1988, Usama Bin Laden and *al Qaeda* received funding from various non-governmental organizations, and relied on various non-governmental organizations including charitable organizations to transfer money and provide cover for traveling *al Qaeda* members and associates.

### Hezb e Islami

F. In the latter part of the 1980s and continuing in the 1990s, an organization known as *Hezb e Islami* existed in Afghanistan and elsewhere whose purposes included engaging in armed confrontation in Afghanistan. *Hezb e Islami* maintained training camps in Afghanistan as well as a working relationship with Usama Bin Laden, *al Qaeda* and *mekhtab al khidemat*.

### Lajnat Al-Birr Al-Islamiah

G. In or about 1987, an organization known as "*Lajnat Al-Birr Al-Islamiah*" ("Islamic Benevolence Committee")(hereafter "LBI") was founded by Adel Batterjee in Saudi Arabia and Peshawar, Pakistan. One of the purposes of LBI was to raise funds in Saudi Arabia to provide support to the *mujahideen* then fighting in Afghanistan. LBI also provided cover for fighters to travel in and out of Pakistan and obtain immigration status.

3

## Benevolence International Foundation, Inc.
### ("*Al Birr al Dawalia*")

H.    In or about the early 1990's, LBI was renamed
"Benevolence International Foundation" (hereafter "BIF"), referred
to in Arabic as "*Al Birr al Dawalia*," and incorporated in the
United States.   LBI did so in an effort to appear to have more
universal concerns and increase its appeal to the public as well as
its credibility with other governments, including but not limited
to the United States, and organizations, including but not limited
to the United Nations, all of which was designed to increase
donations and reduce scrutiny by authorities.   The successor
organization shared assets with the prior organization, adopted a
nearly identical logo as LBI and continued to hold itself out as
having been formed in 1987.   In or about March 1993, BIF received
status as a tax-exempt organization from the Internal Revenue
Service.   Adel Batterjee initially remained a director of BIF.

I.    In or about 1993, after scrutiny of BIF by a foreign
government, Batterjee resigned as a director of BIF, although he
continued to play an important role in financing BIF.   Around the
same time, defendant ARNAOUT assumed formal management of BIF.   BIF
proceeded to open offices in various locations including, but not
limited to, Pakistan, Bosnia-Herzegovina, Azerbaijan and the Sudan.
Some of the overseas offices operated under different names; for
example, BIF's office in Bosnia-Herzegovina operated under the name
*Bosanska Idealna Futura*.   Nevertheless, BIF operated as a single

4

entity managed by defendant ARNAOUT and so held itself out publicly.

## The Sudanese Popular Defense Force

J.    Prior to 1991, the National Islamic Front (hereafter "NIF"), the ruling regime in the Sudan, had declared a *jihad* against the Christians living in southern Sudan.  Throughout the 1990's, violent action was taken against the people living in southern Sudan through the *Difaar al Shabi* ("Popular Defense")(hereafter "Sudanese Popular Defense Force") which carried out the violent operations with backing from the NIF and *al Qaeda*. In or about May 1991, after agreement between *al Qaeda* and the NIF, BIF established an office in the Sudan for the purpose of supporting *jihad* and the *mujahideen* generally with military and logistical support by operating camps and providing field medical care for the *mujahideen*.  BIF in the Sudan formed a close working relationship with the Sudanese Popular Defense Force.

## DEFENDANT ENAAM ARNAOUT

K.    In the mid to late 1980s, defendant ENAAM ARNAOUT, using various aliases including "Abu Mahmoud," "Abu Mahmoud al Suri," "Abu Mahmoud al Hamawi," and "Abdel Samia," worked with and for *mekhtab al khidemat* and LBI to provide assistance to fighters in Afghanistan, including members of *Hezb e Islami* and its leader Gulbuddin Hekmatyar, as well as various *mujahideen* including those under the command of Usama Bin Laden.

5

L.   Within that same time frame, defendant ARNAOUT served as director of communications in the "*al Masada*" *mujahideen* camp in Jaji, Afghanistan, under the direction of Usama Bin Laden. Defendant ARNAOUT distributed resources, including weapons, at the direction of Usama Bin Laden and others at that time.

M.   In or about 1991, defendant ARNAOUT, while employed by LBI, worked with others, including members of *al Qaeda*, to purchase rockets and assorted rifles in large quantities and distribute them to various *mujahideen* camps, including camps operated by *al Qaeda*.

## THE BIF ENTERPRISE

2.   At times material to this indictment, BIF and LBI, along with their founders, including Adel Batterjee, their directors, officers, and employees, including defendant ARNAOUT, their offices overseas including *Bosanska Idealna Futura*, and those offices' employees, were associated in fact, and constituted an "enterprise" as that term is defined in Title 18, United States Code, Section 1961(4), which enterprise was engaged in, and the activities of which affected, interstate and foreign commerce. This enterprise, consisting of the aforementioned individuals, entities, and others known and unknown, is hereby referred to for purposes of this count as the "BIF Enterprise." The BIF Enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

6

Defendant ARNAOUT participated in the operation and management of the enterprise. The objectives of the BIF Enterprise were to support the activities of *mujahideen* in various areas of the world by raising funds and providing support to *mujahideen* and others engaged in violence and armed confrontation, including al Qaeda, *Hezb e Islami* and the Sudanese Popular Defense Force.

### THE RACKETEERING CONSPIRACY

3. Beginning in or about 1992 and continuing to in or about May 2002, in Palos Hills, Worth, and other locations in the Northern District of Illinois, Eastern Division, and elsewhere:

> ENAAM M. ARNAOUT,
> a/k/a "Abu Mahmoud",
> a/k/a "Abu Mahmoud al Suri,"
> a/k/a "Abu Mahmoud al Hamawi",
> a/k/a "Abdel Samia",

defendant herein, along with Adel Batterjee and others, being persons employed by and associated with an enterprise, namely the BIF Enterprise, which engaged in and the activities of which affected interstate and foreign commerce, did conspire with other persons known and unknown to the grand jury, to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, that is, through multiple acts indictable under the laws of the United States, namely:

(a) 18 U.S.C. § 1341 (mail fraud);

7

(b)  18 U.S.C. § 1343 (wire fraud);

(c)  18 U.S.C. § 1503 (obstruction of justice); and

(d)  18 U.S.C. § 1956 (money laundering).

4.  It was a part of the conspiracy that defendant ARNAOUT agreed that a conspirator would commit at least two acts of racketeering in the conduct of the affairs of the enterprise.

**PURPOSE, METHOD AND MEANS OF THE CONSPIRACY**

The purpose and substance of the conspiracy was as follows:

**Scheme to Defraud**

5.  It was part of the conspiracy that defendant ARNAOUT and his co-conspirators devised, intended to devise, and participated in a scheme to defraud and to obtain money and property from donors to the BIF Enterprise, by means of materially false and fraudulent pretenses, representations, and promises, and material omissions.

a.  It was part of the scheme that defendant ARNAOUT and his co-conspirators fraudulently solicited and obtained funds from donors and prospective donors to the BIF Enterprise by falsely representing that the BIF Enterprise would use donated funds solely for humanitarian purposes, with a small amount being used for administrative expenses, while concealing the material fact that a portion of the money raised by the BIF Enterprise was being used to support groups engaged in armed confrontations and violence overseas.

b.  It was further part of the scheme that

8

defendant ARNAOUT and his co-conspirators focused their appeals for donations principally on Muslim donors, who were required by the Islamic principle of *zakat* to give a percentage of their income for charitable purposes.

          c. It was further part of the scheme that defendant ARNAOUT and his co-conspirators concealed from many donors to the BIF Enterprise the material fact that funds raised from certain trusted donors to the BIF Enterprise (who were in fact aware that the BIF Enterprise was providing support to groups engaged in armed confrontations and violence overseas) were being commingled with other donors' funds to avoid scrutiny of those donors who knowingly provided money to support violence and armed confrontation.

          d. It was further part of the scheme that members of the conspiracy encouraged donors to use or establish corporate matching programs, through which donors' employers would match in whole or in part donations made to the BIF Enterprise by individual employees.

          e. It was further part of the scheme that defendant ARNAOUT and his co-conspirators concealed from the State of Illinois, the United States government and other governments the fact that a portion of the money raised by the BIF Enterprise was being used to support groups engaged in armed confrontations and violence overseas.

9

f.   It was further part of the scheme that as a result of the material misrepresentations and omissions regarding the nature of the BIF Enterprise's activities by defendant ARNAOUT and his co-conspirators, numerous individuals and corporations provided donations to the BIF Enterprise having been deceived into believing that their contributions would be used for solely humanitarian purposes.

g.   It was further part of the scheme that defendant ARNAOUT and his co-conspirators used BIF's status as a charity and a tax-exempt organization to lessen scrutiny by various governments concerning the financial and other activities of the BIF Enterprise's employees and agents, the BIF Enterprise's overseas offices, and the travel of the BIF Enterprise employees, agents, and associates.

h.   It was further part of the scheme that defendant ARNAOUT and others kept secret from governments and the general public, including a significant number of donors, material facts about defendant ARNAOUT's relationship with organizations engaging in violence, including *al Qaeda*, *Hezb e Islami*, and their leaders, including Usama Bin Laden and Gulbuddin Hekmatyar, and the Sudanese Popular Defense Force.

## Laundering of the Proceeds of the Scheme to Defraud

6.   It was a further part of the conspiracy that defendant ARNAOUT and his co-conspirators agreed to conduct financial

10

transactions, affecting interstate and foreign commerce, by wire transferring funds from BIF's checking accounts in Illinois to bank accounts in various locations, including New Jersey and accounts outside the United States, knowing that the property involved in the transactions represented the proceeds of some form of unlawful activity; with the intent to promote the carrying on of specified unlawful activities, namely, mail and wire fraud in violation of Title 18, United States Code, Sections 1341 and 1343, as described in paragraph 5 of Count One of this indictment; and knowing that the transactions were designed, in whole or in part, to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of the above specified unlawful activities; all in violation of Title 18, United States Code, Sections 1956(a)(1)(A)(i) and (a)(1)(B)(i). It was a further part of the conspiracy that defendant ARNAOUT and his co-conspirators agreed to transport, transmit, and transfer monetary instruments and funds from a place in the United States to or through a place outside the United States with the intent to promote the carrying on of a specified unlawful activity, namely, mail and wire fraud in violation of Title 18, United States Code, Sections 1341 and 1343, as described in paragraph 5 of Count One of this indictment, in violation of Title 18, United States Code, Sections 1956(a)(2).

## Obstruction of Justice

7.     It was a further part of the conspiracy that defendant

11

ARNAOUT and his co-conspirators corruptly endeavored to influence, obstruct and impede the due administration of justice by submitting to the United States District Court false and misleading declarations of defendant ARNAOUT in an effort to obtain an order releasing BIF's funds which had been blocked by the United States Department of the Treasury. The efforts of defendant ARNAOUT included executing, subscribing to and filing materially false declarations under the penalties of perjury in a civil proceeding brought by BIF stating in substance that BIF had never provided aid or support to people or organizations known to be engaged in violence, terrorist activities, or military operations of any nature; in violation of Title 18, United States Code, Section 1503.

## Methods and Means of the Conspiracy

8. The method and means of the conspiracy included the following, among other activities:

A. In or about 1992, defendant ARNAOUT assisted in delivering, assembling and operating a satellite telephone for use in Afghanistan by Gulbuddin Hekmatyar and *Hezb-e-Islami*.

B. Sometime in 1993 or thereafter, members of the conspiracy caused the production of videotapes depicting fighters in Bosnia-Herzegovina and eulogizing dead fighters, including *al Qaeda* members known as "Abu Zubair al Madani" and "Abu Abbas al Madani," and soliciting donations to support the *mujahideen* in Bosnia-Herzegovina.

12

C.    From in or about late June 1992 until at least in or about January 1995, members of the conspiracy provided various items to fighters in Bosnia-Herzegovina, including boots, uniforms, communication stations, and an ambulance.

D.    On or about June 10, 1995, members of the conspiracy caused the delivery of an X-ray machine and currency from the BIF Enterprise to a representative of the Chechen *mujahideen* in Baku, Azerbaijan, for use by the Chechen *mujahideen*.

E.    In or about November 1995, defendant ARNAOUT and other members of the conspiracy caused the shipment of anti-mine boots to Baku, Azerbaijan, ultimately destined for the Chechen *mujahideen*.

F.    Following its initial shipment of anti-mine boots, defendant ARNAOUT and other members of the conspiracy solicited donations from the public to purchase additional anti-mine boots for the *mujahideen*, falsely claiming that the project was for the benefit of civilians.

G.    In or about May 1998, members of the conspiracy, using a letter bearing a signature in the name of defendant ARNAOUT, facilitated the travel of an influential, founding member of the *al Qaeda* network, Mamdouh Mahmud Salim, a/k/a "Abu Hajer al Iraqi," to Bosnia-Herzegovina by indicating that Salim was a director of BIF.

H.    In the latter part of the 1990's, with defendant

13

ARNAOUT's knowledge, Saif al Islam el Masry, a/k/a "Abu Islam el Masry," a member of *al Qaeda*'s *majlis al shura* (consultation council), as well as a top military expert and instructor, served as an officer of the BIF Enterprise in Chechnya.

I.    In or about February 2000, a website seeking money to support the efforts of the *mujahideen* fighting in Chechnya under the command of Ibn al Khattab, a *mujahideen* leader who had fought in Afghanistan, listed BIF as an organization that would receive donations for this purpose.

J.    In or about October 2001, defendant ARNAOUT relayed to the BIF Enterprise founder Adel Batterjee in Saudi Arabia via electronic mail ARNAOUT's concern that ARNAOUT was under scrutiny of the United States government and in particular the fact that defendant ARNAOUT had been searched at the airport upon his return to the United States.

K.    In or about November 2001, a BIF Enterprise employee in Bosnia-Herzegovina told defendant that financial support for an injured fighter could not be reflected on the BIF Enterprise's financial records and that the employee could create a new list of orphans as a means of justifying the expenditures.   Defendant ARNAOUT and the BIF Enterprise employee also discussed a plan of transferring money from an account of BIF in the United States to the BIF Enterprise in Bosnia-Herzegovina without leaving a trail so that the BIF Enterprise could balance its books in light of certain

14

expenses that could not be listed on the books.

L. Beginning at a time unknown through in or about March 2002, defendant ARNAOUT, and employees of the BIF Enterprise, possessed, and attempted to erase in part, in Bosnia-Herzegovina, among other items, an archive of documents and photographs concerning Usama Bin Laden and *al Qaeda* and Gulbuddin Hekmatyar and *Hezb e Islami*, including:

i. a chart of an organization involved in military activity headed by Usama Bin Laden and with which Abdallah Azzam, Abu Ubaidah al Banshiri, and Mamdouh Salim, a/k/a "Abu Hajer al Iraqi," among others, were involved;

ii. notes summarizing several meetings during which *al Qaeda* was formed in Afghanistan in August 1988 (indicating that Usama Bin Laden, Abu Ubaidah al Banshiri and Mamdouh Salim, a/k/a "Abu Hajer al Iraqi," among others, were in attendance), and specifying the text of the original *bayat* (oath of allegiance) made by prospective *al Qaeda* members to *al Qaeda*;

iii. notes reflecting the commencement of *al Qaeda*'s "work" on or about September 10, 1988;

iv. personnel files of the *mujahideen* trained in the *al Masada* camp in Jaji, Afghanistan, in or about 1988, which contained the true names and aliases and military experience of the trainees;

v. a list of wealthy sponsors from Saudi Arabia

15

including references to Usama Bin Laden and Adel Batterjee, the founder of the BIF Enterprise;

vi. various documents reflecting defendant ARNAOUT's involvement in the acquisition and distribution of hundreds of rockets, hundreds of mortars, offensive and defensive bombs, and dynamite, as well as disguised explosive devices in connection with the *al Masada* camp;

vii. various documents in a separate folder reflecting defendant ARNAOUT's participation in obtaining missiles, bombs and mortars in 1989 and 1990 in connection with *Hezb e Islami*;

viii. various newspaper articles including a 1988 article with a photograph depicting Usama Bin Laden, defendant ARNAOUT, and one of the founders of the BIF Enterprise; as well as 1998 articles concerning Usama Bin Laden's threats against the United States and the State Department's 1997 list of designated terrorist organizations;

ix. a February 1992 letter to ARNAOUT requesting assistance with food and clothing for 1200 *mujahideen*;

x. a handwritten organizational chart placing defendant ARNAOUT at the top of a *jihad* organization involved with weapons; and

xi. a series of reports from a *Hezb e Islami* Special Forces camp in the Paktia province of Afghanistan

16

indicating that defendant ARNAOUT had inspected the camp and that 70 *mujahideen* had been sent to Peshawar, Pakistan for a "special matter" and that military training had started as of November 1991, with a class of special forces *mujahideen* graduating in January 1992.

      M.   In or about late 2001 and early 2002, while the BIF Enterprise continued to solicit and receive donations from the public while fraudulently holding itself out as a humanitarian organization that had never supported or financed violence, defendant ARNAOUT individually and through an attorney falsely informed the *Chicago Tribune* newspaper that defendant ARNAOUT did not know Usama Bin Laden personally, that defendant ARNAOUT never fought against the Soviet Union, that defendant ARNAOUT was never at the al Masada camp and that he could not have been there because he was working in a restaurant in the Persian Gulf area during the relevant time frame.

      N.   On or about March 21, 2002, defendant ARNAOUT spoke via telephone to Munib Zaharigac in Bosnia-Herzegovina and learned that Zaharigac had been arrested and that searches had been conducted of various locations in Bosnia-Herzegovina. After being told that no BIF Enterprise documents were seized, defendant ARNAOUT coached Zaharigac about what to tell authorities about persons associated with the BIF Enterprise including himself.

      O.   On March 26, 2002, in an effort to obtain a court

order requiring, among other things, the release of BIF funds blocked by the United States Department of the Treasury, BIF and defendant ARNAOUT submitted a declaration in a civil matter pending in the United States District Court for the Northern District of Illinois, Eastern Division, knowingly and falsely stating: "BIF has never provided aid or support to people or organizations known to be engaged in violence, terrorist activities, or military operations of any nature. BIF abhors terrorism and all forms of violence against human beings." The declaration was executed by defendant ARNAOUT on or about March 22, 2002.

P.    On April 5, 2002, in their continuing effort to obtain a court order requiring, among other things, the release of BIF funds blocked by the United States Department of the Treasury, BIF and defendant ARNAOUT submitted a purported "corrected" declaration in a civil matter pending in the United States District Court for the Northern District of Illinois, Eastern Division, again knowingly and falsely stating: "BIF has never provided aid or support to people or organizations known to be engaged in violence, terrorist activities, or military operations of any nature. BIF abhors terrorism and all forms of violence against human beings." The declaration was executed by defendant ARNAOUT on or about April 1, 2002.

Q.    On or about April 15, 2002, defendant ARNAOUT spoke to the BIF Enterprise director in Pakistan and advised him to avoid

18

government scrutiny in Pakistan by fleeing to Afghanistan with the BIF Enterprise's money and to evade detection by refraining from the use of banks, telephones or electronic mail.

9. It was a further part of the conspiracy that defendant ARNAOUT and others would and did misrepresent, conceal and hide, and cause to be misrepresented, concealed and hidden the purposes of, and acts done, in furtherance of the conspiracy.

All in violation of Title 18, United States Code, Section 1962(d).

## COUNT TWO

The SPECIAL APRIL 2002 GRAND JURY further charges:

Beginning no later than in or about September 1994, and continuing to in or about May 2002, in the Northern District of Illinois, Eastern Division, and elsewhere:

ENAAM M. ARNAOUT,

defendant herein, conspired with others known and unknown to the Grand Jury to commit an offense against the United States, namely, to provide material support and resources to persons, groups and organizations engaged in violent activities – including *al Qaeda*, *Hezb e Islami*, the Sudanese Popular Defense Force, and others engaged in violent confrontations in Chechnya and Sudan – and to conceal and disguise the nature, location, source and ownership of material support and resources, knowing and intending that they be used in preparation for and in carrying out a violation of Title 18, United States Code, Section 956(a)(1) (conspiracy to kill, kidnap, maim or injure persons in a foreign country), in violation of Title 18, United States Code, Section 2339A.

### Overt Acts

2.    In furtherance of the conspiracy and to effect the unlawful objects of the conspiracy, defendant ENAAM M. ARNAOUT and other coconspirators committed and caused to be committed the following overt acts in the Northern District of Illinois and elsewhere:

20

A. In or about 1995, the Chechen *mujahideen* working with *Hezb e Islami* were provided with an X-ray machine and currency;

B. In or about Fall 1995, defendant ARNAOUT coordinated the shipment of anti-mine boots to the Chechen *mujahideen* working with *Hezb e Islami* and made efforts to keep BIF's name from being associated with that shipment on shipping records;

C. In or about 1996, a further shipment of anti-mine boots to the Chechen *mujahideen* working with *Hezb e Islami* was planned;

D. In or about 1997, defendant ARNAOUT provided a military uniform to a coconspirator to serve as a sample for uniforms to be manufactured;

E. In or about April and May 1998, defendant ARNAOUT facilitated the travel in Bosnia-Herzegovina of Mamdouh Salim, a key member of the *al Qaeda* network;

F. In or about late 2000 and early 2001, chemical handwarming devices intended for the representative of the Chechen *mujahideen* working with *Hezb e Islami* were purchased; and

G. In or about March and April 2002, defendant ARNAOUT submitted false declarations under oath to a federal court misrepresenting and concealing material facts about the nature of BIF's work.

All in violation of Title 18, United States Code, Section 371.

21

## COUNT THREE

The SPECIAL APRIL 2002 GRAND JURY further charges:

In or about November 1995, in the Northern District of Illinois, Eastern Division, and elsewhere:

ENAAM M. ARNAOUT,

defendant herein, provided material support and resources, namely, approximately 2900 pairs of steel-reinforced anti-mine boots, to persons, groups and organizations engaged in violent activities, namely, fighters in the Chechnya area of Russia, and concealed and disguised the nature, location, source and ownership of such material support and resources, knowing and intending that they be used in preparation for and in carrying out a violation of Title 18, United States Code, Section 956(a)(1) (conspiracy to kill, kidnap, maim or injure persons in a foreign country);

In violation of Title 18, United States Code, Sections 2339A and 2.

22

## COUNT FOUR

The SPECIAL APRIL 2002 GRAND JURY further charges:

1.  From at least in or about April 1996 and continuing to in or about May 2002, in Palos Hills, Worth, and other locations in the Northern District of Illinois, Eastern Division, and elsewhere:

ENAAM M. ARNAOUT,

defendant herein, did knowingly conspire and agree with others, known and unknown to the Grand Jury, to commit offenses against the United States, namely:

(a)  to conduct financial transactions involving proceeds of specified unlawful activities, namely mail fraud, and wire fraud, knowing that the property involved in the transactions represented the proceeds of some form of unlawful activity, and that the transactions affected interstate and foreign commerce and were conducted: (i) with the intent to promote the carrying on of mail fraud, wire fraud, and material support to organizations engaged in violent activities; and (ii) which were designed, in whole or in part, to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of the specified unlawful activity, in violation of Title 18, United States Code, Sections 1956(a)(1)(A)(i) and (B)(i);

(b)  to transport, transmit and transfer monetary instruments and funds, from a place in the United States to or through a place outside the United States, with the intent to

23

promote the carrying on of specified unlawful activity, namely material support to organizations engaged in violent activities in violation of Title 18, United States Code, Section 1956(a)(2);

2. It was part of the conspiracy that defendant ARNAOUT and other members of the conspiracy agreed to transfer by wire funds from BIF's checking accounts to bank accounts in various locations, including New Jersey and accounts outside the United States, which involved the proceeds of specified unlawful activities;

All in violation of Title 18, United States Code, Section 1956(h).

## COUNT FIVE

The SPECIAL APRIL 2002 GRAND JURY further charges:

On or about April 21, 2001, in the Northern District of Illinois, Eastern Division,

ENAAM M. ARNAOUT,

defendant herein, conducted and attempted to conduct a financial transaction, affecting interstate and foreign commerce, namely, transferring by wire approximately $4000 from BIF's checking account at Citibank FSB to Fleet Bank in Newark, New Jersey, knowing that the property involved in the transactions represented the proceeds of some form of unlawful activity, with the intent to promote the carrying on of specified unlawful activity, namely the mail fraud and wire fraud as described in Count One;

In violation of Title 18, United States Code, Sections 1956(a)(1)(A)(i) and 2.

## COUNT SIX

The SPECIAL APRIL 2002 GRAND JURY further charges:

On or about March 18, 2000, in the Northern District of Illinois, Eastern Division, and elsewhere:

ENAAM M. ARNAOUT,

defendant herein, for the purpose of executing the scheme to defraud described in Count One, knowingly caused an envelope containing a donation check in the amount of $1620 to be delivered by the United States Postal Service according to directions thereon, from a corporation to:

    Benevolence International Fnd
    9838 S Roberts Rd. #1W
    Palos Hills, IL 60465

In violation of Title 18, United States Code, Sections 1341 and 2.

## COUNT SEVEN

The SPECIAL APRIL 2002 GRAND JURY further charges:

On or about June 27, 2000, in the Northern District of Illinois, Eastern Division, and elsewhere:

ENAAM M. ARNAOUT,

defendant herein, for the purpose of executing the scheme to defraud described in Count One, knowingly caused an envelope, containing a donation check in the amount of $1000 to be delivered by the United States Postal Service according to directions thereon, from a corporation to:

Benevolence International Foundation
9838 S Roberts Rd. #1W
Palos Hills, IL 60465

In violation of Title 18, United States Code, Sections 1341 and 2.

## **COUNT EIGHT**

The SPECIAL APRIL 2002 GRAND JURY further charges:

On or about October 1, 2001, in the Northern District of Illinois, Eastern Division, and elsewhere:

ENAAM M. ARNAOUT,

defendant herein, for the purpose of executing the scheme to defraud described in Count One, knowingly caused to be transmitted by means of wire communication, certain signs, signals and sounds, in interstate commerce, namely an electronic transmission of funds in the amount of approximately $10,000 from BIF's checking account at LaSalle National Bank to Fleet Bank in Newark, New Jersey;

In violation of Title 18, United States Code, Sections 1343 and 2.

A TRUE BILL:

_David C. Nelson_

FOREPERSON

ACTING UNITED STATES ATTORNEY

28

02 CR 892

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

VS.

ENAAM M. ARNAOUT

**S U P E R S E D I N G    I N D I C T M E N T**

Violations:

18 U.S.C., § 1962(d)
18 U.S.C., § 2339A
18 U.S.C., § 1956(h)
18 U.S.C., § 1956(a)(1)(A)(i)
18 U.S.C., § 1341
18 U.S.C., § 1343
18 U.S.C., § 371

A true bill,

_David C. Ulen_
_____
Foreman

Filed in open court this _22nd_ day of _January_, A.D. 20_03_

_____
Clerk

MICHAEL W. DOBBINS

Bail, $ _____

_Cara Veis_ Deputy Clerk